ALLEN SCHIFFMAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5992–65. Filed February 28, 1967.

*Martin D. Cohen*, for the petitioner.
*Julius M. Jacobs*, for the respondent.

---

TANNENWALD, *Judge:* Respondent determined deficiencies in petitioner's income taxes for the years and in the amounts as follows:

| Year | Income tax | Addition to tax (sec. 6653(a), I.R.C. 1954) [1] |
|---|---|---|
| 1961 | $10,071.12 | $503.56 |
| 1962 | 8,004.91 | 400.25 |
| 1963 | 9,179.78 | 458.99 |

All references are to the Internal Revenue Code of 1954.

Although the respondent's deficiency notice was not issued until Aug. 27, 1965, there is no issue as to the period of limitations with respect to the taxable year 1961. Petitioner reported gross income of $39,539 and the claimed omissions from gross income aggregate $10,392, or more than 25 percent. See sec. 6501(e).

The parties having settled all other issues raised by the deficiency notice, including respondent's assertion of additions to tax, the sole question remaining for decision is whether certain discounts and rebates, which purchasers of insurance received, reduced petitioner's commissions and therefore are properly excludable from petitioner's gross income.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Petitioner is a resident of Short Hills, N.J., and timely filed his individual income tax returns on a cash basis for the calendar years 1961, 1962, and 1963 with the district director of internal revenue, Newark, N.J.

For approximately 38 years, including the taxable years involved herein, petitioner has been and continues to be engaged, as a sole proprietor, in the insurance business, providing on behalf of various insurance companies different types of general insurance for his customers, including fire, burglary, workmen's compensation, public liability, etc., as well as various types of indemnity and surety bonds. He has been at all times, and continues to be, a licensed insurance broker in the State of New Jersey.

In the course of his business petitioner entered into agency contracts with various insurance companies licensed to issue insurance policies in New Jersey. Though these contracts vary slightly in form or language, they all contain provisions substantially similar to the following:

2. The Agent shall have full power to solicit and accept applications and issue and deliver policies, bonds, certificates, endorsements and binders covering classes of risks which the Company may, from time to time, authorize to be insured or bonded; to collect and receipt for premiums therefor; to cancel such policies and bonds; and to retain out of premiums so collected, as full compensation on business placed with the Company by or through the Agent, commissions in accordance with schedules attached to this Agreement or as may otherwise be mutually agreed upon.

3. Accounts of money due the Company on business placed by or through the Agent with the Company are to be rendered monthly so as to reach the Company's office not later than the 10th day of the following month; the balance

shown to be due the Company shall be paid not later than 60 days after the end of the month for which the account is rendered.

Each agency agreement entered into by petitioner contained a schedule showing the rate of commission (in terms of percentage of premium) to which petitioner was entitled with respect to each type of policy of insurance sold by him. They also provided that the commissions were subject to specific exceptions in cases where rates of commissions other than those listed in the schedule were agreed upon by the parties.

In order to induce some of his customers to obtain their insurance coverage through him, petitioner entered into two types of agreements with customers whose patronage he feared he would otherwise lose. Both types of agreements called for petitioner to bill the customers for the full amount of the premium payable for the kind of insurance involved, in accordance with the schedules filed with the New Jersey Department of Banking and Insurance and as stated in the insurance policies.

Under one type of agreement (hereafter referred to as the "discount" type of agreement) petitioner was to accept, and did accept, from customers a lesser sum than the billed amount, as payment in full thereof. The difference represented an allowance to the customer.

Under the other type of agreement (hereafter referred to as the "rebate" type of agreement) the customer paid petitioner the full amount billed, but thereafter petitioner was required to remit, and did remit, to the customer a portion of the customer's payment, also as an allowance.

It was at the customers' suggestion and insistence that these agreements were consummated. Petitioner's practice of giving discounts and rebates was required by the competitive conditions of petitioner's business.

The insurance companies neither participated in, nor had knowledge of, the giving of the discounts or rebates.

During the years in question, petitioner followed a uniform procedure for reporting and remitting premium payments to the various insurance companies with which he had agreements. Each month petitioner received from each insurance company a statement showing, with respect to each policy for which petitioner was to collect and remit a premium payment, the policy number, the name of the assured, the type of coverage, effective (or renewal) date of the policy, the gross premium, the amount of petitioner's commission, and the net premium, that is, the gross premium less petitioner's commission thereon. As required and authorized under his agency contracts, petitioner rendered a monthly accounting to each insurance company of the premiums due it on the policies issued to his customers and the amounts of his commissions thereon which he was entitled to retain

for himself. This monthly accounting showed, with respect to each policy on which he received a premium payment, the name of the assured, the policy number, the amount of the gross premium on said policy, and the amount of the commission ostensibly due him thereon. Along with these monthly statements, petitioner transmitted to the insurance company his check for the net premiums due the company, that is, the total gross premiums less the total amount of the ostensible commissions.

The discount or rebate given to a customer by petitioner at no time reduced the net premium received by the insurance company; the commission to which the petitioner was otherwise entitled was reduced by the amount thereof.

In computing gross income, petitioner reduced the reportable commissions by the aggregate amount of discounts and rebates received by his customers and included on his returns only the amounts actually retained.

The amounts of such reductions were as follows:

| Taxable year | Discount type | Rebate type |
|---|---|---|
| 1961 | $13,352 | $3,040 |
| 1962 | 7,063 | 4,590 |
| 1963 | 9,565 | 4,024 |

Respondent has determined that petitioner was in error in not including these amounts in his gross income for the respective years.

### OPINION

The sole question before us is whether petitioner is entitled to exclude from his gross income the amount of certain discounts and rebates received by purchasers of general insurance. Petitioner contends that these discounts and rebates were adjustments to premium, i.e., the purchase price of the insurance, and were therefore properly excluded under *Atzingen-Whitehouse Dairy, Inc.*, 36 T.C. 173 (1961), acq. 1961-2 C.B. 3, and *Pittsburgh Milk Co.*, 26 T.C. 707 (1956), acq. 1962-2 C.B. 5. Respondent counters with the assertion that they actually represent a sharing of commissions to which petitioner was otherwise entitled and that petitioner must therefore include the amounts in his gross income and seek to obtain his tax benefit by way of a claim to an offsetting deduction.[2] As authority for his position, respondent relies upon *United Draperies, Inc.*, 41 T.C. 457 (1964), affd. 340 F. 2d 936 (C.A. 7, 1964), certiorari denied 382 U.S. 813.

---

[2] Petitioner, for reasons of his own, concedes that, if we find that he should have included these items in gross income, he is not entitled to an offsetting deduction as an ordinary and necessary business expense. We therefore do not consider this issue. Cf. *Tank Truck Rentals* v. *Commissioner*, 356 U.S. 30 (1958); *Coed Records, Inc.*, 47 T.C. 422 (1967).

Cf. also *Boyle, Flagg & Seaman, Inc.*, 25 T.C. 43 (1955). We agree with petitioner.

We are not enamored by the efforts of the parties to frame the issue herein in semantic terms. As we said in *Pittsburgh Milk Co.*, *supra* at 717:

Terminology, alone, is not controlling; and each type of transaction must be analyzed with respect to its own facts and surrounding circumstances. * * * The test to be applied, as in the interpretation of most business transactions, is: What did the parties really intend, and for what purpose or consideration was the allowance actually made? Where, as here, the intention and purpose of the allowance was to provide a formula for adjusting a specified gross price to an agreed net price, and where the making of such adjustment was not contingent upon any subsequent performance or consideration from the purchaser, then, regardless of the time or manner of the adjustment, the net selling price agreed upon must be given recognition for income tax purposes.

Nor are we impressed with respondent's efforts to distinguish *Atzingen-Whitehouse Dairy, Inc.*, *supra*, and *Pittsburgh Milk Co.*, *supra*, on the ground that in those cases the adjustment was directly between the seller and the purchaser while, in the instant case, the seller, i.e., the insurance company, was neither a party to the adjustment nor acquiesced therein. Indeed, we have found that the insurance companies had no knowledge of petitioner's practice—a finding required by the record before us, but one which our common sense and experience suggest may not accord with the actual facts.

In our judgment, the issue herein does not turn on whether there was a direct confrontation between the customer and the insurance company or whether the latter had knowledge of petitioner's clandestine arrangements. Rather, we think that the fundamental consideration is whether the customer paid or was required to pay such amounts to petitioner, so that it could be said that he received them under a claim of right or turned his back on income to which he was otherwise entitled. It cannot be gainsaid that the arrangements were made by petitioner prior to his sales of insurance. At the moment of sale and billing, his customer was not required to pay and petitioner had no claim to the amount of the discount (which he never received) or the rebate (which he received but was immediately required to refund). It is well settled that, in this type of situation, no distinction should be drawn between the instances in which the customer received a discount and those in which the customer received a rebate. See *Pittsburgh Milk Co.*, *supra* at 716; cf. *Atzingen-Whitehouse Dairy, Inc.*, *supra*.

In *United Draperies, Inc.*, *supra*, and *Boyle, Flagg & Seaman, Inc.*, *supra*, the seller received the stipulated selling price and made his adjustment by way of a rebate to third parties. Indeed, we were careful to point out in *United Draperies, Inc.*, *supra* at 465, that

"petitioner's agreement to pay rebates was made with employees of its customers and was *independent of its agreement with its purchasers* fixing the selling price of the products sold. * * * These amounts were paid for a *consideration separate from the selling price* of its products." (Emphasis added.)[3]

Nor is our reasoning herein inhibited by the cases involving the question whether there is a realization of income when an insurance agent sells insurance to himself or a real estate agent sells a house to himself at a price net of his commission. *Commissioner* v. *Daehler*, 281 F. 2d 823 (C.A. 5, 1960), reversing 31 T.C. 722 (1959); *George E. Bailey*, 41 T.C. 663 (1964), and cases cited therein. In those cases, it can at least be maintained that the taxpayer did receive something as compensation in connection with his employment, namely, the excess of the fair market value of the item over what he paid for it. By way of contrast, petitioner herein neither realized nor could have realized anything beyond the amount he actually reported as income.

We are not unaware of the fact that our holding herein may offer a safe haven for violators of State laws. But both *Atzingen-Whitehouse Dairy, Inc.*, and *Pittsburgh Milk Co.* stand clearly for the proposition that concepts of taxation and considerations of local public policy do not necessarily have to go hand in hand. Cf. *Lilly* v. *Commissioner*, 343 U.S. 90 (1952); *Paramount Finance Co.* v. *United States*, 304 F. 2d 460 (Ct. Cl. 1962).

In order to reflect the other concessions of the parties,

*Decision will be entered under Rule 50.*

---

[3] Cf. *Marlen E. Pew, Jr.*, T.C. Memo. 1961–264.